UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| FRANK F. DAY | ) | |
| (Social Security No. XXX-XX-0166), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:11-cv-114-WGH-SEB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7, 10) and an Order of Reference entered by District Judge Sarah Evans Barker on December 7, 2011 (Docket No. 12).

## I.  Statement of the Case

Plaintiff, Frank F. Day, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f).  This court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB on October 21, 2009, and SSI on April 6, 2010, alleging disability since February 24, 2002, and March 31, 2006, respectively. (R. 96-112).  The agency denied Plaintiff's applications both initially and on reconsideration.  (R. 52-55, 57-62).  Plaintiff appeared and testified at a hearing before Administrative Law Judge William M. Manico ("ALJ") on April 12, 2011. (R. 8-25).  Plaintiff was represented by an attorney.  Also, testifying was a vocational expert ("VE").  (R. 8).  On May 27, 2011, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy.  (R. 29-43).  After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-3).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on September 27, 2011, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on February 28, 1963, Plaintiff was 48 years old at the time of the ALJ's decision, with at least a high school education.[1]  (R. 41-43).  His past relevant work experience included work as a house painter, nurse technician, group home attendant, and subcontractor.  (R. 41).

---

[1]Plaintiff would have been 38 at the time of his alleged onset of disability.  (R. 41).

-2-

**B. Medical Evidence**

    **1. Plaintiff's Impairments**

On April 19, 2003, Plaintiff was admitted to the Bloomington Hospital emergency room with shortness of breath, weakness, and the sensation of his heart racing; he also had pain in his left chest and shoulder pressure. (R. 426-32).

On May 23, 2003, Plaintiff went to the Bloomington Hospital emergency room after he awoke with tachycardia and a feeling of left chest discomfort. (R. 404-12). He had recently experienced shortness of breath throughout the week and some left chest pain earlier that day. (R. 411). He had a recent transient ischemic attack ("TIA") presentation 14 months earlier. However, all of his workups had always been negative, including echocardiogram, carotid ultrasound, EKGs, and chest x-rays. (R. 411). All testing of Plaintiff was normal. (R. 411-12).

On February 9, 2005, Plaintiff visited Brian R. Murer, D.C., whose assessment was mechanical shoulder pain with significant myofascial component; mid back pain; and low back pain–all with a significant myofascial component. (R. 251). He explained to Plaintiff how cumulative injuries throughout a profession (like a painter) with a repetitive motion can cause scar tissue and aberrant biomechanics in his shoulder, which could cause pain in his neck and low back. Dr. Murer indicated that active release techniques could address the scar tissue and restore proper movement in Plaintiff's shoulder,

neck, and low back.  Dr. Murer recommended six treatment sessions to "see if we could get a handle on his pain and restore some function." (R. 251).

On February 19, 2005, Plaintiff was admitted to the Bloomington Hospital emergency room.  (R. 363-71).  Plaintiff complained of shortness of breath, lightheadedness, swelling in his right arm, and that his throat felt swollen.  (R. 363, 369).  It was noted that Plaintiff had suffered an allergic reaction.  (R. 367).

On March 4, 2005, Plaintiff returned to Dr. Murer.  (R. 251).  Plaintiff was only getting transient relief, if any, from his symptoms.  Dr. Murer opined that Plaintiff's pain was metabolic first and mechanical second, and he referred Plaintiff to Ryan Bently, M.D., for nutritional evaluation and treatment concerning Plaintiff's fibromyalgia and chronic fatigue syndrome.  Dr. Murer indicated that he was suspending care of Plaintiff until Plaintiff's metabolic concerns were under control.  (R. 251).

On September 12, 2005, Plaintiff visited the Bloomington Hospital emergency room for vertigo and an upper respiratory infection.  (R. 356).

On August 15, 2006, Plaintiff visited Brian H. Moore, M.D., with complaints of numbness.  (R. 256-59).  Plaintiff described a history of a prior TIA with numbness and pain in his head; numbness in his left face, neck, and arm; crushing headache; and weakness on his left side.  (R. 256).  Plaintiff's pain eventually improved, as did his fatigue, but he still had felt waves of dizziness and imbalance.  (R. 256).  A mental status exam was normal.  (R. 258).  Plaintiff displayed normal strength and reflexes, a full range of motion in all joints, and normal joints and muscles.  (R. 258).  Dr. Moore's assessment was paresthesia,

generalized muscle weakness, and cervical spondylosis with myelopathy; he requested an MRI of the cervical spine. The MRI, performed August 17, 2006, revealed mild spondylosis of the cervical spine and mild disc bulging with small central protrusions at C4-5, C5-6, and C6-7. (R. 260).

On February 7, 2007, Plaintiff was seen by William P. Rusche, M.D., for chronic pain and fatigue. (R. 265). Plaintiff reported persistent pain, most prominent in neck and shoulder regions; severe fatigue; weakness; nonrestorative sleep; ocular irritation; sore throat; breathing difficulty; and poor concentration and memory difficulties. Dr. Rusche's exam revealed several tender points, but no motor deficits. His impression was chronic fatigue and pain syndrome, chronic neck pain, cervical spondylosis, and history of asthma. (R. 265).

On May 9, 2007, Plaintiff was seen by Eric Orth, D.O., with his chief complaint being low testosterone. (R. 277-78). Plaintiff also complained of fatigue and chronic pain that had lasted for over a year. On exam, Plaintiff's neurological and musculoskeletal systems were normal, with normal strength and coordination and a normal gait. (R. 277). Dr. Orth's impression was impotence, abnormal free testosterone level, and fatigue. (R. 278).

On June 25, 2007, Plaintiff underwent a polysomnogram for complaints of snoring and excessive daytime somnolence. (R. 327). The exam revealed mild snoring without evidence of significant sleep disordered breathing. (R. 327).

Records from Dr. Rusche dated August 28, 2007, indicated that Plaintiff displayed 14 tender points. (R. 267).

On September 7, 2007, Dr. Rusche wrote a letter detailing Plaintiff's problems, including:  fibromyalgia syndrome; cervical spondylosis; chronic fatigue; hypotestosteronism; and polyarthritis.  (R. 603).  Dr. Rusche opined that Plaintiff experiences severe limitations with activities of daily living, avocational activities, and all vocational endeavors.  Plaintiff had increased pain and stiffness following exertional activities, which limits his ability to work a regular job.  Dr. Rusche noted that Plaintiff is limited with all activities requiring use of his hands (including repetitive movements), prolonged sitting/standing, or tasks requiring concentration/attention skills.  Plaintiff also experiences frequent flare-ups of his condition, which, according to Dr. Rusche, would prohibit a reliable work schedule.  Numerous attempts at treatment have been failures. Dr. Rusche opined that Plaintiff's impairments would prohibit even a sedentary job, due to fatigue and concentration difficulties, and that Plaintiff was permanently disabled and unable to attain gainful employment of any kind.  The onset of his disability was believed to be January 1, 2005.  (R. 603).

On December 5, 2007, Plaintiff underwent an MRI of his spine.  (R. 315). The impression was:  a small disc protrusion at C6-7, which appeared to at least mildly impinge upon the ventral cord; minimal disc bulging at T2-3; mild changes of facet arthropathy of the lumbar spine; and disc degeneration at L5-S1.  (R. 315).

On September 5, 2008, Dr. Rusche penned another letter indicating that Plaintiff has been under his care for the following:  fibromyalgia syndrome; cervical spondylosis; chronic neck pain; low testosterone; chronic fatigue; and

asthma.  (R. 270).  Dr. Rusche opined that Plaintiff "experiences severe limitations with activities of daily living, avocational activities and all vocational endeavors."  Dr. Rusche indicated that Plaintiff "is permanently disabled and unable to attain gainful employment of any kind," and that "failure to acknowledge [Plaintiff's disability] is a grave disservice to this unfortunate individual."  (R. 270).

On April 12, 2009, Plaintiff was admitted to the Bloomington Hospital emergency room with complaints of upper respiratory infection ("URI") symptoms for one week, with episodes where he felt weak and dizzy.  (R. 303-07).  Family members stated he has had multiple similar occasions in the past, but this occurrence was worse.  (R. 304).  Plaintiff indicated that he had a few palpitations, felt his heart was slower than normal, and had increased swelling. (R. 304).  Plaintiff's neurological exam was normal, he had a normal affect and mood, and he had no extremity tenderness.  (R. 305).  The assessment was fibromyalgia, URI, borderline diastolic BP, moderate elevation of systolic BP, history of TIA.  (R. 307).

On September 22, 2009, Plaintiff underwent a chest X-ray concerning a growth in his lung.  (R. 290).  It was noted that his left lower lobe pulmonary nodule had increased in size since 2003.  It was posited that the growth could represent malignancy or a large granuloma or hamartoma.  A limited chest CT was recommended.  (R. 290).

On October 13, 2009, Plaintiff underwent a CT chest exam.  (R. 288).  The impression was a centrally calcified otherwise soft tissue nodule within the

lateral segment of the left lower lobe.  The findings were noted to be most consistent with hamartoma and/or partially calcified granuloma.  (R. 288).

On November 23, 2009, Plaintiff visited David DeWitte, M.D., with complaints of swelling in his feet and ankles for a year or so that had become worse in the past two weeks.  He had experienced increased swelling in the right leg and pain over the past week.  Dr. DeWitte's assessment was edema.  (R. 458-59).

On November 25, 2009, Plaintiff was admitted to the Bloomington Hospital emergency room with complaints of hives and edema of his lower extremities. (R. 542-47).  The diagnosis was an allergic reaction.  (R. 547).

On December 16, 2009, Dr. Rusche saw Plaintiff for complains of lower extremity edema.  Plaintiff displayed greater than 12 tender points.  Dr. Rusche's assessment was inflammatory arthritis, cervical spondylosis, chronic neck pain, low testosterone, chronic fatigue, and asthma.  (R. 273).

On December 17, 2009, Plaintiff underwent a mental status evaluation by Albert H. Fink, Ph.D.  (R. 490-92).  Plaintiff indicated that he takes lots of breaks; pain makes him grumpy; he gets upset over little things; to get things done he has to work slowly; he feels like he has the flu all the time; he has trouble sitting or standing for very long; and he does not enjoy interacting with people.  (R. 490).  He also reported difficulty sleeping, casual bathing, lack of motivation about anything, headaches, frequent naps, and feelings of tiredness most of the time.  (R. 491).  Plaintiff indicated that he does not need assistance with personal hygiene; prepares simple meals; enjoys following sports; spends a

fair amount of time on the computer; and drives, but not very far.  (R. 491).  He reported that he is depressed and worried much of the time.  (R. 491-92).  Dr. Fink indicated that Plaintiff was friendly and cooperative, had a mildly dysphoric mood, and a somewhat constricted affect.  (R. 491).  Plaintiff had no unusual thought processes, bizarre ideation, or suicidal thoughts.  (R. 491).  He was alert and fully oriented.  (R. 491).  Dr. Fink opined that Plaintiff's depressed mood and anxiety did not appear to be significant impediments to his functioning, and that his main difficulties appear to be medical in nature.  (R. 492).  Dr. Fink's impression was mood disorder and anxiety disorder with a Global Assessment of Functioning ("GAF") score of 62.  (R. 492).  Dr. Fink opined that Plaintiff's cognitive/affective status appeared adequate for comprehending tasks of minimal to moderate complexity; his memory functions appear adequate for dealing with tasks of minimal to moderate complexity; he should be able to concentrate and be persistent for periods of minimal to moderate duration; and he should be able to manage social interactions in the workplace, if they are limited in their intensity.  (R. 492).

Hadi Husni Hatoum, M.D., conducted a consultative examination of Plaintiff on February 6, 2010.  (R. 517-19).  He indicated that Plaintiff probably had asthma, as well as arthralgia, fibromyalgia, chronic back pain, and fatigue. (R. 517).  Dr. Hatoum also noted Plaintiff's history of TIA where he had left-sided numbness and headaches.  (R. 517).  In addition, Plaintiff reported ankylosing spondylitis in his neck in which he gets flare-ups with neck pain and stiffness radiating to his left arm.  (R. 517).  His neck pain is exacerbated by lifting any

objects with his left arm, and he has tingling, numbness, and difficulty gripping objects over his left arm.  (R. 517).  Plaintiff stated he can walk about a quarter of a mile, stand five minutes, climb 20 stairs, and lift around ten pounds with his right arm and five pounds with his left arm.  (R. 517).  On exam, Plaintiff had no evidence of edema; some limitations in lumbar extension; a normal posture and gait; normal joints; and normal reflexes, senses, and strength.  (R. 519).  Dr. Hatoum's clinical impression was significant for asthma, ankylosing spondylitis in his neck, hypogonadism, and fibromyalgia.  (R. 519).

Plaintiff visited Dr. Rusche again on April 1, 2010, with complaints of chronic pain and arthritis.  (R. 264).  Plaintiff reported persistent pain symptoms, especially at the small joints of his hand and feet.  He also indicated neck and low back pain, fatigue, and decreased function and mobility due to joint swelling and stiffness.  On exam, Plaintiff had greater than 12 tender points.  Dr. Rusche's assessment was inflammatory arthritis, fibromyalgia, chronic fatigue, cervical spondylosis, chronic low back pain, chronic neck pain, low testosterone, and history of asthma.  Dr. Rusche refilled Plaintiff's methadone, recommended range of motion exercises, and set a follow-up for three months.  (R. 264).

Plaintiff began mental health therapy with Bloomington Behavioral Health on May 5, 2010, because of worsening depression.  (R. 599-601).  He indicated that he and his siblings had all suffered from depression and that his sister had committed suicide.  (R. 599).  Plaintiff's mental status exam was essentially normal except that his affect was intense.  He was oriented and alert, and his

speech, memory, insight, judgment, and attention/concentration were all normal.  (R. 600).  He was assigned a GAF of 40.  His symptoms included the following severe problems:  anhedonia; chronic problems sleeping; depressed, angry mood; hopelessness; increased appetite–has gained 50 pounds; poor memory and concentration; and very low energy.  (R. 600).

On May 10, 2010, Plaintiff attended therapy at Bloomington Behavioral Health.  (R. 596-98).  Plaintiff was diagnosed with fibromyalgia, arthritis, and cervical ankylosing spondylitis.  (R. 596).  He indicated that he had been very depressed for the past few months–related to pain syndrome.  He noted that he was tired of dealing with the pain, and if there was a way to end things, he would, except that he would never kill himself because he knew how much pain suicide could cause a family since his sister had committed suicide.  (R. 596).  He described always being in pain all over, and that sometimes it is worse than others.  He was frustrated, tired, and angry dealing with pain.  He moved in December and now he feels it was a more isolating choice.  He has no friends in the new location and has no energy.  (R. 596).  Plaintiff's mental status exam was essentially normal.  He was oriented and alert; his affect was appropriate; and his speech, memory, insight, judgment, and attention/concentration were all normal.  (R. 598).  His diagnosis was major depressive disorder, recurrent, severe without psychotic features, chronic.  Plaintiff was assigned a GAF of 42.  (R. 597).

Plaintiff attended another therapy session at Bloomington Behavioral Health on June 3, 2010.  (R. 590-91).  Plaintiff's affect was constricted.  (R. 591).

-11-

Plaintiff's diagnosis continued to be major depressive disorder, recurrent, severe without psychotic features, chronic.  He was assigned a GAF of 42.  (R. 591). His symptoms continued to include the following severe problems:  anhedonia; chronic problems sleeping; depressed, angry mood; hopelessness; increased appetite–has gained 50 pounds; poor memory and concentration; and very low energy.  (R. 591).

On June 24, 2010, Plaintiff visited Bloomington Behavioral Health for another therapy session.  (R. 588-89).  He indicated that he was not as depressed as he had been previously, and he was sleeping well at night.  It was noted that Plaintiff felt isolated and did not leave the house or have a support system beyond his wife.  He was assigned a GAF of 42.  (R. 588).

Plaintiff attended a therapy session at Bloomington Behavioral Health on July 6, 2010.  (R. 586-87).  It was noted that Plaintiff was in better spirits, and from a physical standpoint he was able to walk and even do some work in his garden.  (R. 586).  He was going to be "Mr. Mom" for his two children during the summer.  (R. 586).  Plaintiff's diagnosis continued to be major depressive disorder, recurrent, severe without psychotic features, chronic.  He was again assigned a GAF of 42.  (R. 587).

On February 15, 2011, Plaintiff visited Dr. Rusche.  (R. 617).  Plaintiff had a recent flare-up of his symptoms.  Plaintiff reported persistent insomnia and non-restorative sleep, as well as frequent awakenings secondary to nocuria. He also had morning headache and episodic blurred vision.  On exam, Plaintiff had greater than 12 tender points.  (R. 617).

On April 1, 2011, Dr. Rusche wrote another letter describing his opinions of Plaintiff's condition.  (R. 602).  He indicated that he had followed Plaintiff for over five years for chronic arthritis, myofascial pain, and severe fatigue.  It was Dr. Rusche's opinion that Plaintiff's musculoskeletal symptoms prohibited him from gainful employment of any kind.  Dr. Rusche noted Plaintiff's numerous therapeutic modalities, including medications, physical therapy, and home exercises, and he explained that, despite these measures, which have previously included prescription opioid medications, Plaintiff continues to experience severe stiffness, limited range of motion at the upper and lower extremities, decreased endurance, and fatigue.  Dr. Rusche "strongly believe[s] he is permanently disabled from any employment," explaining that all attempts by Plaintiff to resume any capacity have been unsuccessful.  (R. 602).  Plaintiff's current diagnoses included lumbar and cervical spondylosis, rheumatism, other malaise and fatigue, insomnia, microscopic hematuria, lumbago, cervicalgia, unspecified inflammatory polyarthropathy, obesity, low testosterone, and elevated CRP.  (R. 602).

On April 13, 2011, Dr. Rusche noted Plaintiff's complaints of chronic pain and stiffness.  Plaintiff had greater than 12 tender points.  Dr. Rusche's assessment was inflammatory arthropathy, fibromyalgia syndrome, chronic low back pain, chronic neck pain, and osteoarthritis in Plaintiff's hands and knees.  (R. 610).

## 2. State Agency Review

Ann Lovko, Ph.D., completed a Mental Residual Functional Capacity Assessment on January 19, 2010. (R. 499-501). She indicated that Plaintiff had moderate limitations in the ability to maintain attention and concentration for extended periods; moderate limitations in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in the ability to interact appropriately with the general public. Otherwise, Plaintiff was not significantly limited from a mental standpoint. (R. 499-500).

On January 19, 2010, Dr. Lovko also completed a Psychiatric Review Technique. (R. 503-16). She indicated that Plaintiff had mild restrictions of activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 513). On May 18, 2010, William A. Shipley, Ph.D., affirmed the findings of Dr. Lovko. (R. 584).

J. Sands, M.D., completed a Physical Residual Functional Capacity Assessment on February 24, 2010. (R. 523-30). He limited Plaintiff to lifting 20 pounds occasionally and ten pounds frequently. (R. 524). Plaintiff could stand and/or walk and sit for six hours each in an eight-hour day. (R. 524). He was unlimited in pushing and pulling. (R. 524). He could never climb ladders/ropes/scaffolds, but could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (R. 525). Plaintiff had no environmental or

-14-

manipulative limitations.  (R. 526-27).  Dr. Sands indicated that Plaintiff's osteoarthritis and obesity contributed to these limitations.  (R. 528).  On May 20, 2010, M. Ruiz, M.D., reviewed the decision of Dr. Sands and concluded that it should be affirmed.  (R. 585).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see also Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson*, 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is

defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2009; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 31). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had five impairments that are classified as severe: (1) affective disorder; (2) anxiety-related disorder; (3) arthritis; (4) osteoarthritis; and (5) fibromyalgia. (R. 31). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404,

-16-

Subpart P, Appendix 1.  (R. 33).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible.  (R. 35-41).  Consequently, the ALJ concluded that Plaintiff retained the following RFC: lift and/or carry 20 pounds occasionally and ten pounds frequently; unlimited pushing and pulling; stand/walk and sit for six hours each in an eight-hour workday; occasionally climb ramps or stair; occasionally balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; perform simple, unskilled work where contact with others is routine and superficial; cannot perform fast-paced production work; and requires a regular work break approximately every two hours.  (R. 35).  The ALJ opined that Plaintiff did not retain the RFC to perform his past work.  (R. 41).  However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy.  (R. 42). The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 42).

## VI.  Issues

Plaintiff has essentially raised six issues.  The issues are as follows:

1.  Whether the ALJ erred at Step Two.

2.  Whether the ALJ's credibility determination is patently wrong.

3.  Whether the opinions of Plaintiff's treating physician are entitled to controlling weight.

4.  Whether the ALJ's RFC finding is supported by substantial evidence.

5.  Whether the ALJ's limitation to simple, unskilled work accounted for moderate limitations in concentration, persistence, and pace.

6.  Whether the ALJ impermissibly picked and chose what evidence to rely on.

**Issue 1:      Whether the ALJ erred at Step Two.**

Plaintiff's first contention is that the ALJ erred at step two of the five-step sequential evaluation process by failing to find Plaintiff's ankylosing spondylitis of the neck, hypogonadism, left lung tumor, sleep deprivation/fatigue, obesity, and depression to be severe impairments.  As discussed above, 20 C.F.R. § 404.1520 provides a five-step evaluation process.  Step two of that process involves determining if an individual has a severe impairment.  Step two is simply an initial screening device to eliminate consideration of individuals who have only slight impairments.  *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984).  As then District Judge David Hamilton indicated:

> As long as the ALJ proceeds beyond step two, as in this case, no reversible error could result solely from his failure to label a single impairment as 'severe.'  The ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant past step two.  What matters is that the ALJ considers the impact of all of the claimant's impairments – 'severe' and 'not severe' – on her ability to work.

*Gordon v. Astrue*, 2007 WL 4150328 at *7 (S.D. Ind. 2007).

In this instance, the ALJ clearly indicated that Plaintiff's ankylosing spondylitis of the neck, hypogonadism, left lung tumor, and sleep deprivation were not severe impairments, and he explained in great detail why the objective medical evidence demonstrated that these were not severe impairments.  (R. 31-32).  The ALJ also examined the objective medical evidence concerning Plaintiff's mental impairments and the limitations that they cause and determined that

-18-

Plaintiff had two severe mental impairments:  affective disorder and an anxiety-related disorder.  As the Commissioner has explained, depression fits into the category of affective disorders; therefore, Plaintiff is incorrect in arguing that the ALJ failed to find his depression severe.  Because the ALJ explained in great detail why some of Plaintiff's impairments were not severe, there was no error at step two.  Additionally, the ALJ proceeded beyond step two and analyzed all of Plaintiff's symptoms that were supported by objective medical evidence (regardless of whether they were the result of severe or non-severe impairments) and reasonably concluded that Plaintiff retained an RFC for a limited range of light work.  Because the ALJ proceeded beyond step two and considered all of Plaintiff's impairments, both severe and non-severe, the ALJ's step-two analysis must be affirmed.

**Issue 2:      Whether the ALJ's credibility determination is patently wrong.**

In addition, Plaintiff argues that the ALJ conducted a flawed credibility determination.  Plaintiff argues that the ALJ's credibility determination was flawed because it was boilerplate and, therefore, did not comply with SSR 96-7p.

An ALJ's credibility determination will not be overturned unless it is "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  However, here, the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms.  The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.*  This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4).  These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted).  SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including:  (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In this case, the ALJ's assessment of Plaintiff's credibility can be found at R. 35-41.  The ALJ began by noting Plaintiff's allegations concerning his limitations:

> He alleges that his pain makes him irritable and angered easily.  He states exertion makes things worse, requiring him to work slowly and take breaks in order to complete a task.  (Exhibit 3E page 2).  He

alleges difficulty focusing, learning, and remembering. He states he feels like he has the flu all the time. As for exertional limitations, he alleges difficulties sitting and standing for long periods, difficulty holding tools and pens due to stiffness, he must change posture/positions frequently and sometimes needs to lie flat when he experiences bouts of dizziness. (Exhibit 3E page 2). From a mental standpoint, claimant alleges that he does not enjoy interacting with people, when he tires he cannot focus or remember information, when his fatigue sets in he is unable to get out of bed, and that little things irritate him and make him unsociable. (Exhibit 3E page 2).

(R. 35-36). The ALJ determined that these allegations were not credible to the extent that they were inconsistent with Plaintiff's RFC. (R. 36). The ALJ then went on to explain that Plaintiff was also not fully credible because his complaints were inconsistent with the objective medical evidence. (R. 36-41).

The ALJ's credibility determination, while not perfect, was in accordance with SSR 96-7p and 20 C.F.R. § 404.1529. Specifically, with regard to activities of daily living, earlier in his decision, the ALJ had noted that Plaintiff was only mildly restricted because Plaintiff's reports indicated that he could help with laundry and with doing the dishes twice a week for one to two hours; that he went out three times a week, either driving his car or riding with someone; that he would go out to restaurants or shop for groceries and occasionally would shop online; that he enjoyed reading blogs online and watching televison; that he does not require any direct assistance with personal hygiene or dressing; and that he can prepare simple meals for himself, follows sports, and is able to drive. (R. 34).

Next, concerning Plaintiff's treatment and the effectiveness of medications, the ALJ noted that Plaintiff's pain and range of motion had significantly improved when his fibromyalgia had been treated by a nutritionist (R. 37); that Plaintiff's

hypogonadism improved with testosterone treatment, and he experienced more energy and a better libido, among other improvements (R. 38); and that Plaintiff reported depression but was only taking Ambien and took "no psychiatric medication" (R. 40).

Finally, as for the objective medical evidence, the record reflects that the ALJ gave great weight to the opinions of four state agency physicians (Dr. Lovko, Dr. Shipley, Dr. Ruiz, and Dr. Sands), two consultative examiners (Dr. Fink and Dr. Hatoum), and three of Plaintiff's other doctors (Dr. Orth, Dr. Murer, and Dr. DeWitte) and concluded that this evidence indicated that Plaintiff's complaints were not credible.  (R. 41).

In this instance, the Magistrate Judge can trace the path of the ALJ's reasoning as to why the ALJ concluded that Plaintiff's complaints were not fully credible, and the ALJ's credibility determination was, therefore, not patently wrong.

**Issue 3:**    **Whether the opinions of Plaintiff's treating physician are entitled to controlling weight.**

Next, Plaintiff alleges that the ALJ impermissibly failed to give controlling weight to the opinions of his treating physician, Dr. Rusche.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari*, 270 F.3d 1171, 1177-78 (7th Cir. 2001).

Here, as explained in great detail above, Dr. Rusche wrote three letters (in September 2007 (R. 603), September 2008 (R. 270), and April 2011(R. 602)) indicating that Plaintiff was totally disabled.  The ALJ's decision to not grant controlling weight to these opinions (R. 37) is supported by substantial evidence.  First, the ALJ correctly noted that, in accordance with SSR 96-5p, the ultimate decision on whether or not an individual is "disabled" is reserved to the Commissioner.  Hence, the ALJ was free to reject the opinions expressed by Dr. Rusche that indicated that Plaintiff was totally disabled.

Second, the ALJ noted that Dr. Rusche's findings were inconsistent with Plaintiff's activities of daily living as they were described to Dr. Fink.  The ALJ was correct to point out these inconsistencies.  For example, Dr. Rusche had found in September 2007 that Plaintiff experiences severe limitations with activities of daily living, avocational activities, and all vocational endeavors.  Dr. Rusche noted that Plaintiff is limited with all activities requiring use of his hands, prolonged sitting/standing, or tasks requiring concentration/attention skills.  (R. 603).  These findings appear to be inconsistent with Plaintiff's report to Dr. Fink that he enjoys following sports and spends a fair amount of time on the computer.  Someone with the severe difficulties in concentration and severe problems with the use of their hands would not be likely to report being able to use the computer and follow sports.

Finally, the ALJ rightly indicated that Dr. Rusche's findings were inconsistent with other objective medical evidence.  As the ALJ noted, Dr. Rusche's findings were inconsistent with the findings of consultative examiner

Dr. Hatoum who found no evidence of edema; some limitations in lumbar extension; a normal posture and gait; normal joints; and normal reflexes, senses, and strength.  (R. 519).  However, Dr. Hatoum was not the only doctor to find normal results.  An examination by Dr. Orth revealed that Plaintiff's neurological and musculoskeletal systems were normal, with normal strength and coordination and a normal gait.  (R. 277).  Given that some of the opinions provided by Dr. Rusche are on issues reserved for the Commissioner, that some of Dr. Rusche's opinions are inconsistent with Plaintiff's activities of daily living, and that Dr. Rusche's opinions are inconsistent with other objective medical evidence in the record, the ALJ was free to reject Dr. Rusche's opinions.

**Issue 4:      Whether the ALJ's RFC finding is supported by substantial evidence.**

Plaintiff also argues that the ALJ's assessment of Plaintiff's RFC was flawed.  Specifically, Plaintiff argues that the ALJ overstated Plaintiff's RFC, relied too heavily on Plaintiff's activities of daily living, and failed to comply with SSR 96-8p.

First, with regard to the allegation that the ALJ overstated Plaintiff's RFC, Plaintiff argues that "[t]he ALJ's functional capacity assessment is for a range of light work, exceeding the activity level testified to by [Plaintiff]; and, certainly exceeding Dr. Rusche's assessments of [Plaintiff]'s capabilities."  (Plaintiff's Brief in Support of Claim at 20).  However, as discussed above, the ALJ's decision not to grant controlling weight to Dr. Rusche's opinions is supported by substantial evidence, and the ALJ's credibility determination was not patently wrong.  The ALJ, therefore, did not err when he found that Plaintiff retained an RFC for a

greater level of work than Plaintiff testified (or Dr. Rusche opined) that he could perform.

Second, contrary to Plaintiff's allegations, nowhere in the ALJ's decision did he refer to Plaintiff's activities of daily living and conclude that those activities of daily living conclusively proved that Plaintiff could engage in substantial gainful activity. Instead, the ALJ merely referenced Plaintiff's activities of daily living (R. 32-33) to explain why Plaintiff's mental impairment was severe at step two, but did not, at step three, meet or substantially equal any of the listing-level impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. This did not amount to an improper reliance on Plaintiff's activities of daily living.

Third, with regard to SSR 96-8p, Plaintiff is correct that an ALJ's RFC assessment must include a narrative discussion of the objective medical evidence and how it supports the RFC assessment. The ALJ, in this instance, thoroughly went through all of the objective medical evidence, including the opinions of Plaintiff's treating physician, Dr. Rusche, as well as two consultative examiners, the state agency physicians, and all other doctors who examined Plaintiff. (R. 36-40). The ALJ also noted several hospital records and other exam results such as MRIs and x-rays of Plaintiff's back. (R. 39). The ALJ explained how the consultative exams performed by Dr. Fink (R. 39) and Dr. Hatoum (R. 36), which routinely included normal to mild findings, as well as the opinions rendered by the state agency doctors, Dr. Sands and Dr. Lovko, supported the ALJ's RFC assessment. The ALJ also resolved conflicts in the evidence in accordance with SSR 96-8p by rejecting the opinions of Dr. Rusche to the extent that they were

not supported by other objective medical evidence in the record and by rejecting some extremely low GAF scores because they were not supported by the essentially normal mental exam results.  Nothing the ALJ did ran afoul of SSR 96-8p.

In conclusion, the ALJ's RFC findings are supported by substantial evidence.  The ALJ did not overstate Plaintiff's abilities.  Neither did the ALJ rely too heavily on Plaintiff's activities of daily living.  Finally, the ALJ's RFC findings comply with the requirements of SSR 96-8p.  Consequently, the ALJ's RFC determination must be affirmed.

**Issue 5:      Whether the ALJ's limitation to simple, unskilled work accounted for moderate limitations in concentration, persistence, and pace.**

Plaintiff next claims that the ALJ's RFC assessment did not account for Plaintiff's affective disorder and anxiety-related disorder.  Specifically, Plaintiff argues that a limitation to simple, unskilled work does not account for Plaintiff's moderate limitations in concentration, persistence, and pace.  The ALJ, at both step two and step three, determined that Plaintiff had "moderate difficulties" with concentration, persistence, and pace (R. 33-34), and he was, therefore, bound by this finding at the remaining steps of the sequential evaluation process.  The ALJ asked a hypothetical question to the VE that included a limitation to "simple, unskilled work where contact with others is routine and superficial; no fast-paced production work; needs a regular work break, approximately, every two hours" (R. 21), but the ALJ did not mention the actual words "moderate difficulty maintaining concentration, persistence, and pace."

Generally, a hypothetical question posed by an ALJ to the VE must include all of the limitations that are supported by medical evidence in the record. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Recently, the Seventh Circuit, in *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-20 (7th Cir. 2010), explained that, in most cases, a hypothetical question that includes a term like simple, unskilled work does not account for moderate limitations in concentration, persistence, and pace. In *O'Connor-Spinner*, the Seventh Circuit noted that an ALJ does not have to use the magic words "concentration, persistence, and pace." *Id.* at 619. And, remand may not be necessary in certain circumstances such as: (1) where the record revealed that the VE had reviewed the claimant's medical records or heard testimony about the limitations; (2) where the ALJ used alternative phrasing and "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform"; or (3) where the ALJ's hypothetical question specifically mentioned the underlying condition that caused the difficulties with concentration, persistence, and pace. *Id.* at 619-20. "Yet, for most cases, the ALJ should refer expressly to limitations on concentration, persistence, and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id.* at 620-21.

The court concludes that this is one of those instances where the ALJ's failure to include the actual words "moderate difficulty in concentration, persistence, and pace" in his hypothetical question to the VE does not require

-28-

remand.  The ALJ's hypothetical question uses alternate phrasing that adequately excludes those jobs that someone with moderate difficulties with concentration, persistence, and pace would be unable to perform.  First, the limitation to simple, unskilled work accounts for Plaintiff's difficulties with concentration.  Second, the limitation to no fast-paced production work accounts for Plaintiff's moderate difficulties with pace.  And third, the allotment of one break approximately every two hours accounts for Plaintiff's moderate difficulties with persistence.  Consequently, the ALJ's RFC finding and his hypothetical question to the VE adequately accounted for Plaintiff's moderate limitations with concentration, persistence, and pace.

**Issue 6:      Whether the ALJ impermissibly picked and chose what evidence to rely on.**

Finally, Plaintiff argues that the ALJ impermissibly discounted a GAF score of 40 found in an exam from Bloomington Behavioral Health, while the ALJ actually granted considerable weight to the remaining findings of the exam. Plaintiff argues that this proves that the ALJ was simply picking that evidence which supported his decision, while ignoring the evidence that did not.  However, the ALJ explained in great detail why he was rejecting the GAF score.  (R. 40).  As the ALJ noted, the objective medical evidence reveals that Plaintiff attended Bloomington Behavioral Health on May 5, 2010, where his mental status exam was essentially normal; he had an intense affect, but he was oriented and alert, and his speech, memory, insight, judgment, and attention/concentration were all normal.  (R. 599-601).  Despite these relatively normal mental findings, Plaintiff was assigned a GAF score of 40, which is a relatively severe finding indicating

"some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." The ALJ reasonably determined that the GAF score did not match an essentially normal mental status exam. Plaintiff attended four more sessions at Bloomington Behavioral Health from May to July 2010, and he routinely displayed normal mental status exam results, but his GAF score never rose above 42. Based on these facts, there was nothing improper about the ALJ's decision to discount such low GAF scores when they did not match Plaintiff's relatively normal mental status exam results.

## VII.  Conclusion

The ALJ's decision is supported by substantial evidence. The ALJ did not err at step two when he failed to find some of Plaintiff's impairments to be severe. The ALJ's credibility determination was not patently wrong. The ALJ was not required to give controlling weight to Dr. Rusche's opinions. The ALJ's mental and physical RFC assessments accounted for all of Plaintiff's limitations. And, the ALJ did not impermissibly pick and chose which evidence to rely on. The final decision of the Commissioner is, therefore, **AFFIRMED.** Judgment consistent with this entry shall now issue.

**SO ORDERED** this 18th day of April, 2012.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov